Louis B. Heller, J.
This is an application by landlord petitioners pursuant to article 78 of the CPLR to vacate and set aside the decision of the respondent City Commission on Human Rights made after a hearing on the complaint of Mrs. Esther Henderson, a Negro. The landlord petitioners were adjudged guilty of discrimination in the rental of an apartment in a multiple dwelling owned by them. For the sake of simplicity, the landlords, a husband and wife, will hereafter be referred to in the singular.
On Sunday, August 28, 1966 the complainant Mrs. Henderson observed an advertisement in the New York Sunday News offering a 4-room apartment for rent at $107.33 per month. Mrs. Henderson enlisted the aid of two white people, Mrs. Rioghan Kirschner and Mr. Eugene Heller (not related to the court), members of Focus, a civil rights organization which combats discrimination in housing, in an attempt to rent the apartment.
Mrs. Henderson, through the attorney for the City Commission on Human Rights, proved that racial discrimination was the sole cause of her failure to secure the apartment, by eliciting testimony designed to show the comparison between the treatment accorded to the Negro complainant Mrs. Henderson, and the treatment accorded to the white Mrs. Kirschner, who posed as a prospective tenant. Mrs. Kirschner went to the landlord’s home with Mr. Heller, representing herself to be Mr. Heller’s *980 widowed sister-in-law who wanted an apartment for herself and her three children. (Mrs Henderson, the complainant, is a widow with three children.) The landlord asked questions about Mrs. Heller’s (Kirschner) income and children.
After the interview, the landlord said that she and her husband, who was also present, would drive over to show Mrs. “ Heller ” the apartment, and that Mr. and Mrs. Heller should follow in their car. Complainant Mrs. Henderson and her children were waiting outside in Mr. Heller’s car during the interview. Mr. Heller then went to the car and dropped off the Hendersons. After driving to the apartment house in question, the landlord showed Mr. and Mrs. Heller an apartment similar to the one which was soon to be vacated, because the landlord was involved in unpleasant litigation with the tenant of the advertised apartment.
Mrs. Heller (Kirschner) told the landlord that she liked the apartment but that she wanted to look at one other apartment before she left a deposit. The landlord tried to induce her to leave a deposit, insisting that she would not be able to hold the apartment without one. The Hellers made the six-minute trip back to where Mrs. Henderson had been dropped off. They picked up complainant and her children, told her that the apartment was very nice, that she would probably like it, and that she should immediately go to the landlord to attempt to see it.
Complainant Mrs. Henderson and her daughter walked the short distance to the landlord’s home and arrived within 12 to 15 minutes after the Hellers and the landlord had left the advertised apartment. When Mrs. Henderson inquired about the apartment, the landlord replied that she had just rented it to Mrs. Heller. Complainant then asked why the sign advertising a vacant apartment was still in the window, whereupon the landlord removed the sign.
Mrs. Henderson then asked the landlord whether she was discriminating against her because she was a Negro. The landlord vehemently denied this, saying ‘ ‘ Why should I discriminate against you? One God made us all. I won’t discriminate against anyone.” (She could have added, as Gilbert and Sullivan might have phrased it, “ Well, hardly anyone.”)
The testimony taken before the Commissioners totals 202 pages and it is unnecessary to repeat it all here. Suffice it to say that the very next day, a white couple, Mr. and Mrs. Cohen, also working with Focus, called the landlord and made an appointment to see the apartment at 8:00 that evening. At about 6:00 p.m. the landlord telephoned Mrs. Heller (Kirschner) and left a message that a couple was coming over to sign a lease *981 and asked her whether she was interested in coming down about 9:00 p.m. in case the deal fell through.
The landlord showed the Cohens the same apartment that they had shown to Mrs. Heller (Kirschner). The Cohens said they liked the apartment and returned to the landlord’s home to leave a deposit. While the receipt was being written out, Mr. Cohen testified, the landlord’s husband said that it was their policy to have applicants come to their home, explaining that you never know who the people are on the telephone.
The landlord’s version of the events in question is substantially different from the testimony of Mrs. Henderson, Mrs. Kirschner, Mr. Heller and Mr. Cohen, and is not only in itself inconsistent, but incredible. The landlord testified that when she and her husband returned from showing the apartment to Mrs. Heller, a Mrs. Keller was waiting at their house. Earlier that month, in response to an advertisement for a three-room apartment, Mrs. Keller had looked at both a three and a four-room apartment in the building in question. She agreed then to return at the end of the month when the four-room apartment was to become available. She did not, however, leave her address or telephone number. Mrs. Keller had then returned in answer to the new advertisement. She was in a hurry, left a $25 cash deposit with the landlord for which she did not receive a receipt and agreed to return the next day.
The landlord claims that all this transpired in the 12 to 15 minutes which had elapsed between the “ Hellers ’ ” departure and Mrs. Henderson’s arrival at the landlord’s home. When the complainant arrived, the landlord said she had just rented to Mrs. Keller, not Mrs. Heller. Mrs. Henderson became angry and said she would keep an eye on the case and left immediately. At another point in the hearing the landlord testified that she told Mrs. Henderson that she had taken a deposit on the apartment, but that she would let Mrs. Henderson know if the rental did not materialize. Significantly, the landlord never asked for nor did she take Mrs. Henderson’s name, address or telephone number. How on earth she intended to communicate with Mrs. Henderson if the occasion arose is a question that can only be rhetorical.
The landlord further testified that the following day she set up an appointment with Mr. and Mrs. Cohen despite the fact that she had received a deposit from Mrs. Keller because she could never be certain that the person who left the deposit would actually rent the apartment. She stated that she never risks losing a customer. (Never? Hardly ever.)
*982 Later that day, the landlord’s story continues, Mrs. Keller returned to her house but did not sign a lease because the landlord would not permit Mrs. Keller to have a washing machine or a dog. After failing to sign a lease with Mrs. Keller, the landlord telephoned Mrs. Heller to find out if she was still interested in the apartment. Mrs. Heller said she was, but at 9 o ’clock that evening called back to inform her that her children were ill and that she would be unable to come. It was after this conversation that the Cohens came to the landlord’s house where they left a deposit and agreed to sign a lease at a later date.
The commission considered the evidence and found that the testimony of the landlord that a Mrs. Keller, whose name conveniently rhymed with Heller, had viewed the apartment weeks earlier, had responded immediately to the new advertisement, had arrived, pressed $25 in cash upon the landlord and departed in a matter of minutes without receiving a receipt and without leaving her address or phone number, was incredible. Mrs. Keller, like a wraith, came and went in a matter of minutes without leaving any information by which she could be traced. This fantasy fabricated by the landlord is completely beyond belief.
The 'commission found that even if the Mrs. Keller story were to be believed, it would come to the conclusion that Mrs. Henderson was subjected to an unlawful discriminatory practice. According to the landlord’s own testimony, she made arrangements to show Mr. and Mrs. Cohen the apartment before the illusory Mrs. Keller withdrew her deposit. She represented to Mrs. Henderson, a Negro, that the apartment was unavailable; whereas to the white couple, the apartment was completely available.
The record is barren of any indication that the landlord ever sought information about complainant Mrs. Henderson’s background to determine whether or not she might be a suitable tenant for the apartment she was trying to rent. Mrs. Henderson was a supervisor of the national office in New York for the United Presbyterian Church Commission on Religion and Race. The landlord attempted to show that she does not discriminate because she had rented an apartment to a Spanish-speaking dark complected man, once employed a colored janitor, has German and Ukranian tenants and enjoys good landlord-tenant relationships with two Italian families at another building she owns! This interesting information has no bearing on whether or not the finding of an illegal discriminatory act against the complainant because she was a Negro was supported by suffi *983 cient evidence in the record, and that as a direct result of this willful, unlawful, discriminatory practice the complainant suffered considerable humiliation, outrage and mental anguish.
The landlord claims that she was the victim of a concerted scheme designed and carried out by members of Focus, the civil rights group. She contends that every step of the way was preconceived; that a group of professionals had carefully plotted to entrap her. Be that is it may, the court is aware that ofttimes, without resorting to such methods, a charge of discrimination could never be substantiated under the law. (Matter of Kindt v. State Comm. for Human Rights, 44 Misc 2d 896, mod. 23 A D 2d 809, affd. 16 N Y 2d 1001.)
Such discrimination is generally subtle and covert, and direct evidence of discrimination can otherwise rarely be presented. A finding of discrimination can usually only be based upon deduction from a series or pattern of seemingly innocent acts taken together and viewed as a totality.
Section Bl-9.0 of the Administrative Code of the City of New York provides for judicial review of a determination of the City of New York Commission on Human Bights. The section provides in part that the commission’s findings “as to the facts shall be conclusive if supported by sufficient evidence on the record considered as a whole.” A review of the entire record reveals that there was sufficient evidence to support the factual findings and conclusions of the Commissioners. Therefore the order predicated thereon should be enforced. (Matter of Feigenblum v. Commission on Human Rights of City of N. Y., 53 Misc 2d 360.)
The witnesses who testified at the hearing bore out substantially the charged violation of law. The commission had a right to sift the evidence and reject the false and base its inferences on what it accepted as true. (Matter of Kindt v. State Comm. for Human Rights, 44 Misc 2d 896, mod. 23 A D 2d 809, affd. 16 N Y 2d 1001, supra.) Moreover, since the credibility of witnesses and subleties of conduct are important factors in cases of this nature, the court will not attempt to substitute its judgment for that of the hearing Commissioners. (Matter of Lawrence Gardens v. State Comm. for Human Rights, 53 Misc 2d 20.)
The great City of New York, with its cosmopolitan population consisting of large numbers of people of every race, color, creed, national origin and ancestry, which is the very essence of its greatness, cannot afford to tolerate the existence of groups prejudiced one against the other, and antagonistic to each other because of differences of race, color, creed, national origin or *984 ancestry. The New York City Commission on Human Bights was created with power to eliminate such discrimination which threatens the rights and proper privileges of its inhabitants and menaces the foundations of a free democratic state.
Prejudice, intolerance and bigotry are cancers in our society. Discrimination based on the color of a man’s skin or the manner in which he worships the Creator must be stamped out before the hurts, frustrations, disillusionment and despair engendered by this disease with its concomitant anger and disorder engulf us all.
The recent decision of the United States Supreme Court (Reitman v. Mulkey, 387 U. S. 369) upholding the Supreme Court of California which had held unconstitutional the infamous Proposition 14 adopted by the State of California which permanently prohibited the Legislature from limiting the rights of a Californian to sell or rent his real property “to such person as he, in his absolute discretion, chooses,” is a landmark in the cause of human dignity.
The United States Supreme Court, in keeping with the inexorable march of civilized society, held, in effect, that in a democracy, the house a man lives in may very well be his castle, but he has no right to make it a bastion for bigotry or a stronghold for segregation.
New York State and New York City can take pride in their leadership and laws in the field of fair housing.
The landlord petitioners’ application is denied and the cross motion of the respondent is granted.